## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

MARTHA WILSON and
TIMOTHY CHABOT,

      Plaintiffs,

vs.                                           No. CIV 10-0797 JB/WPL

ALBUQUERQUE POLICE OFFICERS
JENNIFER JARA and DANIEL VAZQUEZ,

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

    **THIS MATTER** comes before the Court on Plaintiff Martha Wilson's Motion for Summary Judgment, filed July 6, 2011 (Doc. 31).  The Court held a hearing on October 4, 2011.  The primary issues are: (i) whether Defendants Jennifer Jara and Daniel Vazquez seized Plaintiff Wilson in her home in violation of the Fourth Amendment of the United States Constitution; (ii) whether Jara and Vazquez searched Wilson's home in violation of her Fourth-Amendment rights; (iii) whether Jara and Vazquez arrested Wilson without probable cause when they arrested her for resisting arrest and obstruction; (iv) whether qualified immunity shields Jara and Vazquez from civil liability under 42 U.S.C. § 1983; and (v) whether the Family Violence and Protection Act, N.M.S.A. 1978, § 40-13-7, shields the Defendants from civil liability.  The Court concludes that Jara and Vazquez unconstitutionally seized Wilson in her home and that the Defendants are not entitled to qualified immunity on that claim.  The Court will therefore grant Wilson's Motion for Summary Judgment as it pertains to the unconstitutional seizure.  Because of factual disputes, the Court will deny Wilson's Motion for Summary Judgment as it relates to all other claims that Wilson asserts in Count III.

## FACTUAL BACKGROUND

While the Defendants dispute many of Wilson's statements of allegedly undisputed facts, most, if not all, of the material facts are undisputed.[1]

On August 16, 2007, Wilson and Plaintiff Timothy Chabot, Wilson's son, were at their home, an apartment on Tramway Boulevard in Albuquerque, New Mexico.  See Deposition of Martha Wilson at 30:15-19 (taken June 8, 2011), filed July 6, 2011 (Doc. 31-1)("Wilson Depo."); Plaintiff Martha Wilson's Motion for Summary Judgment ¶1, at 1, filed July 6, 2011 (Doc. 31)("Motion SJ")(setting forth this fact); Defendants' Response to Plaintiff Martha Wilson's Motion for Summary Judgment as to Count III at 2, filed July 27, 2011 (Doc. 38)("Response")(admitting this fact).  Wilson shared her home with T. Chabot and her daughter, Haley Chabot.  See Wilson Depo. at 28:24-21:5; Motion SJ ¶ 2, at 1(setting forth this fact); Response at 2 (admitting this fact). Jara and Vazquez were dispatched to Wilson's home on a complaint about two males fighting.  See Deposition of Jennifer Jara at 32:2-4, filed July 6, 2011 (Doc. 31-2)("Jara Depo."); Motion SJ ¶ 3, at 1(setting forth this fact); Response at 2 (admitting this fact).  H. Chabot made a 911 call to report: (i) an altercation between her friend and her brother, T Chabot; (ii) that she did not know if T. Chabot had weapons; and (iii) that T. Chabot had grabbed Wilson by the arms.  See Albuquerque Police Department Research and Recording Incident Recall History, filed July 27, 2011 (Doc. 38-1)("Incident History"); Dispatch Recording of Haley Chabot's 911 Call (dated August 16, 2007),

---

[1]At the October 4, 2011 hearing, Wilson conceded that she did not dispute the additional facts that the Defendants set forth in their Response.  See Transcript of Hearing at 36:24-37:3 (October 4, 2011)(Court, Kennedy)("Tr.").  Wilson also stated, however, that she did not consider the Defendants' additions to be material facts.  See Tr. at 37:9-13 (Kennedy).

filed July 27, 2011 (Doc. 38-2)("H.'s 911 Call"); Response ¶ A, at 6 (setting forth this fact).[2]

Wilson's neighbor, Lydia Deraymus, also made a 911 call, reporting a woman screaming for help,

and a neighbor named Dennis made a 911 call, reporting fighting and yelling.   See Dispatch

Recording of Lydia Deraymus's 911 Call at 3:14-17 (dated August 16, 2007), filed July 27, 2011

(Doc. 38-3)("L.'s 911 Call"); Dispatch Recording of Dennis' 911 Call at 3:18-20 (dated August 16,

2007), filed July 27, 2011 (Doc. 38-4)("D.'s 911 Call"); Response ¶¶ B-C, at 6 (setting forth these

facts).   Jara made contact with H. Chabot in the apartment complex upon arrival, and H. Chabot

stated that her brother, T. Chabot, had spat on her and that he was still at home.   See Jara Depo. at

35: 22-25; Motion SJ ¶ 4, at 2 (setting forth this fact); Response at 2 (admitting this fact).   H. Chabot

also stated that T. Chabot was intoxicated and belligerent, and had yelled that he wanted to kill

someone.   See Jara's Police Report at 1 (dated August 16, 2007), filed July 27, 2011 (Doc. 38-

5)("Jara Report"); Jara Depo. at 34:23-35:7; Response ¶ D, at 6 (setting forth this fact).   H. Chabot

was outside the home at the time of the interview.   See Jara Depo. at 33: 7-8; Motion SJ ¶ 5, at

2(setting forth this fact); Response at 2 (admitting this fact).   After speaking with H. Chabot, the

disturbance call turned into a domestic violence call.   See Jara Depo. at 35:17-20; Response ¶ G, at

7 (setting forth this fact).   At this point, the Defendants had probable cause to arrest T. Chabot for

domestic violence.   See Jara Depo. at 21:20-22:21; Response ¶ H, at 7 (setting forth this fact).   The

alleged incident had occurred anywhere from one hour to two hours before the police arrived.   See

---

[2]Wilson did not file a Reply motion.  Pursuant to D.N.M.LR-Civ. 56.1(b): "The Reply must contain a concise statement of those facts set forth in the Response which the movant disputes . . . . All material facts set forth in the Response will be deemed undisputed unless specifically controverted." D.N.M.LR-Civ. 56.1(b).  Additionally, during the hearing, Wilson conceded that she does not dispute any of the Defendants' additional facts and considers them immaterial.  See Tr. 36:24-37:13 (Court, Kennedy).  The Court will therefore deem all the additional facts set forth in the Response admitted.

Wilson Depo. at 42:17-18; Motion SJ ¶ 6, at 2(setting forth this fact); Response at 2 (admitting this fact).

Vazquez knew that H. Chabot did not intend to return home that evening.  See Deposition of Daniel Vazquez at 26:8-13 (taken July 8, 2011), filed July 6, 2011 (Doc. 31-3)("Vazquez Depo."); Motion SJ ¶ 7, at 2 (setting forth this fact).[3]  After interviewing H. Chabot, Jara and

---

[3]Wilson asserts that the "officers knew" that H. Chabot did not intend to return home.   See Vazquez Depo. at 26:8-13; Motion SJ ¶ 7, at 2 (setting forth this fact).  The Defendants dispute this assertion, stating that Vazquez guessed that H. Chabot was going to return home while Jara did not recall.  See Response ¶ 7, at 2.  Jara did not recall whether H. Chabot planned on returning home. See Jara Depo. 38:23-25 ("Q. Okay.  Did she tell you what she was going to do that night? A. She might have.  I don't remember.").  The Defendants have specifically controverted this statement as it relates to Jara.  The Defendants refer the Court to Vazquez' deposition, where counsel questioned him about where H. Chabot was going to stay:

> Q. All right.  Did you receive any information from Officer Jara prior to going to the apartment of Timothy Chabot as to whether Haley Chabot intended to stay at that apartment that night, or was she intending to stay somewhere else?
>
> A. If I recall, she was going somewhere else.
>
> Q. All right.  So it's fair to say that prior to approaching the apartment of Timothy Chabot, that you had knowledge that Haley Chabot was going -- was intending to stay at another residence.
>
> A. Yes.

Vazquez Depo. at 26:3-13.  In the deposition, Vazquez stated that he remembered that H. Chabot "was going somewhere else."  Vazquez Depo. at 26:3-13.  Nothing in that portion of the deposition suggests that Vazquez was unsure or guessing.  The Defendants did not direct the Court's attention to any evidence that controverts the assertion that Vazquez knew that H. Chabot was staying elsewhere.  The Court will therefore deem Wilson's assertion partially admitted.  D.N.M.LR-Civ. 56.1(b) states:

> The Response must contain a concise statement of the material facts cited by the movant as to which the non-movant contends a genuine issue does not exist.  Each fact in dispute must be numbered, must refer with particularity to those portions of the record upon which the non-movant relies, and must state the number of the movant's fact that is disputed.  All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.

Vazquez went to the Wilson home and knocked on the door.  See Vazquez Depo. at 31: 3-10; Motion SJ ¶ 8, at 2 (setting forth this fact); Response at 2 (admitting this fact).  Jara and Vazquez announced themselves, remaining outside the apartment, and Wilson answered the door.  See Vazquez Depo. at 31:8-25; Deposition of Daniel Vazquez at 32:1 (taken July 8, 2011), filed July 27, 2011 (Doc. 38-6)("Vazquez Depo."); Deposition of Launa Markel at (taken November 30, 2010), filed July 27, 2011 (Doc. 38-7)("Markel Depo."); Response ¶ I, at 7 (setting forth this fact).  Wilson's apartment is at the top of a stairwell.  See  Vazquez Depo. at 29:18-20; Response ¶ F, at 7 (setting forth this fact).  There was no disturbance at the apartment when they arrived.  See Vazquez Depo. at 36: 10-12; Motion SJ ¶ 9, at 2 (setting forth this fact); Response at 2 (admitting this fact).

When Wilson answered the door, Jara and Vazquez informed Wilson that H. Chabot indicated that T. Chabot had committed domestic violence upon her and requested to speak with T. Chabot.  See Transcript of Officer Jara's Belt Tape at 2:18-3:10 (August 16, 2007) filed July 27, 2011 (Doc. 38-8)("Jara's Belt Tape"); Response ¶ J, at 7 (setting forth this fact).  Wilson explained to Jara and Vazquez that H. Chabot had a male friend over and that an argument between the friend and T. Chabot "escalated into a fight."  Wilson Depo. at 44:2-5; Motion SJ ¶ 10, at 2 (setting forth this fact); Jara's Belt Tape at 3:2-8; Response ¶ 10, at 7 (disputing this fact).[4]  Jara and Vazquez told

D.N.M.LR-Civ. 56.1(b)(emphasis added).

[4]Wilson asserts that she answered the door and explained to Jara and Vazquez that H. Chabot had a male friend over and that he argued with T. Chabot.  See Wilson Depo. at 44:2-5 (setting forth this fact).  The Defendants dispute part of this fact and assert that Wilson did not tell Defendants that a male friend at the house argued with T. Chabot, but that the encounter had "escalated into a fight." See Jara's Belt Tape at 3:2-8; Response ¶ 12, at 2; Response ¶ K, at 8.  To dispute this fact, the Defendants rely on Jara's Belt Tape, in which Wilson says: "My daughter had a boy here . . . And the kid called my son a name and that escalated into a fight."  Jara's Belt Tape at 3:2-4.  Because the Belt Tape contains the exact quote of what Wilson said, the Defendants -- the non-moving party

Wilson that they needed to conduct the investigation into the domestic violence allegation, and that required speaking to T. Chabot.  See Jara Depo. at 39:23-24; Motion SJ ¶ 11, at 2; Response at 2 (admitting this fact).  Wilson stated multiple times that T. Chabot was "in bed," and "not doing anything," in response to Jara and Vazquez' requests to speak with him.[5]  Jara told Wilson that it did not matter that T. Chabot was in bed, and, when asked, Wilson agreed that T. Chabot was intoxicated.  See Jara's Belt Tape at 3:12-15; Response ¶ L, at 8 (setting forth this fact).

---

-- have thus controverted Wilson's assertion that there was an argument, and the Court will modify Wilson's asserted fact to include Wilson's exact statement.

[5]Wilson asserts that she told Jara and Vazquez that she did not want them to talk to her son.  See Wilson Depo. at 36:13-20; Motion SJ ¶ 12, at 2 (setting forth this fact); Response ¶ 12, at 2 (disputing this fact).  Jara's Belt Tape demonstrates that the officers and Wilson had the following exchanges:

> Male Voice: Well, we need to talk to your son, ma'am.
>
> Female Voice: He's in bed.
>  . . . .
>
> Female Voice: So do you have any (inaudible) is fine.  He's in bed now and she left.
> . . . .
>
> Officer Jara: -- I am having a problem with you ma'am.
>
> Female Voice: And he's in bed.
> . . . .
>
> Female Voice: He's in his room.  He's not doing anything right now.

Jara's Belt Tape at 3:10-11, 4:1-2, 5:10-1, 6:15-16.  Because the Belt Tape recorded the exact conversation between the officers and Wilson, the Defendants have controverted Wilson's assertion that she told Jara and Vazquez she did not want them to speak to T. Chabot and the Court will modify Wilson's asserted fact to include Wilson's exact statement.  Again, the Court must construe the facts in a manner most favorable to the Defendants, the non-moving party.  See Hunt v. Cromartie, 526 U.S. 541, 551 (1999)(stating that the court must resolve all reasonable inferences and doubts in favor of the non-moving party, and construe all evidence in the light most favorable to the non-moving party)

Wilson expressed concern that the officers might tase her son.  See Jara's Belt Tape at 3:17-25; Response ¶ M, at 8 (setting forth this fact).  Jara and Vazquez responded that they had no intention of tasing T. Chabot, repeated their request to speak to T. Chabot, and stated that they did not want any problems with Wilson.  See Jara's Belt Tape at 3:17-4:25; Response ¶ M, at 8 (setting forth this fact).  Wilson continued to refuse to retrieve T. Chabot, and denied that Jara and Vazquez were having a problem with her.  See Jara's Belt Tape at 5:1-17; Response ¶ N, at 8 (setting forth this fact).  Jara and Vazquez ordered Wilson to go get her son or they would come in to get him.  See Jara Depo. at 45:2-12, 61:22-23, 62:15-17; Motion SJ ¶ 13, at 2 (setting forth this fact); Jara's Belt Tape at 6:15-7:4; Response ¶ O, at 8.[6]  Wilson asserts that she did not feel free to terminate the encounter.  See Wilson Depo. at 45:21-46:8; Motion SJ ¶14, at 2 (setting forth this fact).[7]  After Jara

---

[6]The Defendants dispute the sequence in which Wilson suggests Jara and Vazquez ordered Wilson to go get her son or they would go get him.  See Response ¶ 13, at 2-3.  The Defendants assert that, instead, the Defendants requested to speak to Wilson's son multiple times while continually argued with Jara and Vazquez until, eventually Jara and Vazquez asked that she retrieve her son or they would come in and get him.  See Response ¶ 13, at 2-3.  The Court has admitted several of the Defendants' Additional Material Facts, which alter the sequence of events.  The Defendants do not dispute the substance of Wilson's asserted fact, and the Defendants assert a similar fact in their additional facts.  See Response ¶ 13, at 2-3; Response ¶ O, at 8 ("Plaintiff Wilson continues to refuse to go get her son, to which Officer Jara tells her to go get her son, and Officer Vazquez adds that they would have to go in there to go get him.").  Because the Court admitted additional facts which address this dispute, and because the Defendants do not dispute the substance of Wilson's asserted fact, the Court will deem Wilson's asserted fact admitted.  See D.N.M.LR-Civ. 56.1(b).

[7]The Defendants dispute this fact, because Wilson never told Jara and Vazquez that she did not feel free to terminate the encounter and assert that, under United States v. Abdendi, 361 F.3d 1282, 1292-93 (10th Cir. 2004), Wilson's subjective intent is irrelevant.  See Jara's Belt Tape at 3:1-7:25; Response ¶ 14, at 3.  Wilson does not assert that she told Jara or Vazquez that she did not feel free to terminate the encounter; she merely states how she felt.  See Motion SJ ¶ 14, at 2.  Because the Defendants have not directed the Court's attention to evidence in the record controverting this asserted fact, the Court will deem this asserted fact admitted.  See D.N.M.LR-Civ. 56.1(b).  Whether this fact is relevant is a legal argument, and the Court will not address United States v. Abdendi at this time, but will consider it in its legal analysis.  See Ruiz v. City of Brush, No. 05-897, 2006 WL 1816454, at *4 (D. Colo. June 30, 2006)("[T]he 'sole purpose' of the required statements of and

stated that they could go in to get him, Wilson responded that she would retrieve T. Chabot.  See

Jara's Belt Tape at 6:15-7:4; Response ¶ Q, at 8 (setting forth this fact).  Jara and Vazquez allowed

Wilson to retrieve her son alone, despite officer safety concerns.  See Vazquez Depo. at 44:1-13;

Response ¶ Q, at 8 (setting forth this fact).  Wilson went to retrieve her son and voluntarily left the

door open.  See Jara Depo. at 49:15-18; Deposition of Martha Wilson at 46:9-19 (dated June 8,

2011), filed July 27, 2011 (Doc. 38-9)("Wilson Depo."); Motion SJ at ¶ 16, at 3 (setting forth this

fact); Response ¶ R, at 9 (setting forth this fact).[8]  Jara would not have let Wilson close the door and

terminate the encounter.  See Jara Depo. at 49:15-50:4, 62:15-21; Motion SJ ¶ 15, at 2 (setting forth

this fact).[9]

---

responses to undisputed material facts is 'to establish facts and determine which of them are in dispute[;] [l]egal argument should be reserved for separate portions of the brief.'")(citation omitted).

[8]Wilson asserts that the door to her apartment was left open so that the Defendants could watch her.  See Jara Depo. at 49:15-18; Response ¶ 16, at 3.  The Defendants dispute that there is any evidence suggesting the reason why Wilson left the door open.  See Jara's Belt Tape at 3:1-7:25; Response ¶ 16, at 3.  In Jara's deposition, counsel questioned her about the door .

> Q: Did -- do you recall whether Ms. Wilson closed the door or left the door open when she went back to get Timothy?
>
> A: I don't remember.  I know that she didn't close the door because we could still see in the front room, and we wouldn't have let her do that -- or I wouldn't have.  I'm not going to speak for Officer Vazquez.

Jara Depo. at 49:12-18.  The Defendants are correct; the evidence does not support Wilson's assertion that the door was left open so that the Defendants could watch Wilson.  The Court, therefore, will modify Wilson's asserted fact.

[9]The Defendants dispute this fact, asserting that Wilson voluntarily left the door open and that there was no discussion between the parties that the door had to remain open.  See Wilson Depo. at 49:9-18; Jara's Belt Tape at 3:1-7:25; Response ¶ 15, at 3.  What Wilson asserts, however, is not that she was coerced into leaving the door open, but that, had she tried, Jara would not have permitted her to do so.  See Motion SJ ¶ 15, at 2.  In her deposition, Jara stated: "I know she didn't close the door because we could still see in the front room, and we wouldn't have let her do that --

Wilson retrieved T. Chabot, and he stood in the doorframe, but still in the interior of the

apartment.  See Wilson Depo. at 47:8-13; Motion SJ ¶ 17, at 3 (setting forth this fact).[10]  Jara and

_____

or I wouldn't have."  Jara Depo. at 49: 15-18.  When asked directly whether Jara would have let
Wilson close the door to terminate the encounter, Jara responded: "No, I wouldn't have."  Tr. at 50:
2-4.  The Defendants' evidence does not controvert Wilson's asserted fact.  Because the Defendants
have not directed the Court's attention to evidence controverting Wilson's asserted fact, the Court
will deem Wilson's asserted fact admitted.  See D.N.M.LR-Civ. 56.1(b).

[10]Wilson's full assertion is that T. Chabot came to the area around the interior of the open
door and explained that he was in a dispute with his sister's friend, but that he did not do anything.
See Motion SJ ¶ 17, at 8.  The Defendants dispute this fact and assert that T. Chabot came up to the
doorframe.  See Response ¶ 17, at 3 (citing Jara Depo. at 53:16-18).  The Defendants also dispute
that T. Chabot attempted to explain his actions when he initially approached Jara and Vazquez.  See
Response ¶ 17, at 3 (citing Jara's Belt Tape 7:14-23).  In Jara's deposition, she answered several
questions about where T. Chabot was standing in relation to the door.

> Q: So I guess at some point Timothy comes out towards the door.  Is that fair?
>
> A: Yes.
>
> Q: Does he ever walk out of the apartment?
>
> A: No.
>
> Q: Or initially, anyways?
>
> A: No.
>
> Q: Where does he come to rest or sit or stand?
>
> A: Stand.
>
> Q: And where does he stand in relationship to the door or the threshold of the door?
>
> A: Just behind the frame of the door.

Jara Depo. at 53:7-18.  The Defendants' cited portions of the deposition do not specifically
controvert that T. Chabot was standing in the area around the open door's interior, nor does this
evidence establish that T. Chabot was standing in the doorframe.  Jara's deposition testimony states
that T. Chabot was inside the apartment "behind the frame of the door," not that he was in the
doorframe.  Jara Depo. at 53:16-18.  The Defendants also attempt to establish that T. Chabot was
in the doorframe in the additional material facts, and point the Court to another portion of Jara's

Vazquez asked T. Chabot to speak with them at the bottom of the stairs.  See Vazquez Depo. at

49:9-12; Motion SJ ¶ 18, at 3 (setting forth this fact); Response ¶ T, at 9 (setting forth this fact).[11]

Wilson responded that T. Chabot did not need to go downstairs with them, and Vazquez repeated

his request.  See Jara's Belt Tape at 7:14-23; Response at ¶ T, at 9 (setting forth this fact).  T. Chabot

did not voluntarily go outside.  See Vazquez Depo. at 51:1-5; Motion SJ ¶ 19, at 3 (setting forth this

fact).[12]  Jara and Vazquez ordered T. Chabot to go downstairs to speak with them, and said that he

_____

deposition and to Vazquez' deposition.  See Reponse ¶ S, at 9; Deposition of Jennifer Jara at 54:1 (taken June 9, 2011), filed July 27, 2011 (Doc. 38-10)("Jara Depo.");  Vazquez Depo. at 46:1-7.  In this portion of the deposition, Jara is asked: "Okay.  When he first comes out, do you recall where Ms. Wilson [sic] stands?"  Jara Depo. at 53:24-25.  Jara responds: "They are both in the same -- in the door frame."  Jara Depo. at 54:1.  In Vazquez' deposition, when asked a similar question, Vazquez states: "I'm saying he was right there at the door frame.  I don't know how –."  Vazquez Depo. at 46:6-7.  Vazquez also agrees that it would be fair to say that T. Chabot came right up to the door area and that Wilson was in front of T. Chabot, but still inside the apartment.  See Vazquez Depo. at 46:13-14, 47:2-6.  Given the inconsistencies in the testimony about where T. Chabot was standing, the Court believes that there is a factual issue whether T. Chabot was in the doorframe.  All of the deposition testimony, however, consistently states that T. Chabot remained inside the apartment.  Because the Court must construe the evidence in the light most favorable to the non-moving party, the Court will accept as true the assertion that T. Chabot was standing in the doorframe.  See Hunt v. Cromartie, 526 U.S. at 551.  The conversation recorded on Jara's Belt Tape does, however, indicate that T. Chabot did not initially attempt to his explain his actions and specifically controverts Wilson's asserted fact.  See Jara's Belt Tape 7:14-23.  The Court will therefore modify Wilson's asserted fact to omit the portion indicating that T. Chabot initially attempted to explain himself.

   [11]The Defendants dispute this fact.  The substance of their dispute is over the timing of the request.  See Response ¶ 18, at 3 (citing Jara's Belt Tape at 7:14-23).  Because the Court already determined that T. Chabot did not attempt to explain anything upon coming to the door, there is nothing in this factual assertion that the Defendants still dispute.  The Court will deem this fact admitted, because the Defendants do not specifically controvert it.  See D.N.M.LR-Civ. 56.1(b).

   [12]Wilson asserts that T. Chabot said he would not go downstairs.  See Motion SJ ¶ 19, at 3 (citing Vazquez Depo. at 51:1-5).  The Defendants dispute this statement, assert that T. Chabot did not tell Jara and Vazquez that he would not go downstairs, and argue that it was Wilson who told T. Chabot he did not have to go downstairs.  See Response ¶ 19, at 4.  In his deposition, Vazquez answers several questions about how T. Chabot responded to Jara and Vazquez' request:

        Q: What happens after that?

had no choice but to follow their order.  See Jara Depo. at 67:4-8; Motion SJ ¶ 20, at 3 (setting forth

this fact).[13]  Wilson blocked T. Chabot from going downstairs, at which point Jara and Vazquez

decide to arrest T. Chabot based on the battery of H. Chabot.  See Jara Report at 1; Vazquez Depo.

at 51:12-52:20; Response ¶ U, at 9 (setting forth this fact).

       Jara and Vazquez reached into the apartment, beyond the threshold, to arrest T. Chabot, and

T. Chabot stepped deeper into the apartment.  See Jara Depo. at 72:9-23; Vazquez Depo. at 52:1-25,

57:20-25; Wilson Depo. at 50:7-14; Motion SJ at ¶¶ 21- 22, at 3 (setting forth these facts); Response

¶ V, at 9.[14]  When T. Chabot retreated, Wilson grabbed Vazquez' arm and the force of T. Chabot's

_____

       A: I believe we were still trying to talk to Timothy to come down with us and talk to us.

       Q: Okay. And does he voluntarily go outside?

       A: No he does not.

Vazquez Depo. at 51:1-5.  The Defendants are correct that T. Chabot did not say that he would not
go downstairs.  See Jara's Belt Tape 7:14-23.  Vazquez' deposition indicates, however, that T.
Chabot was not voluntarily heading downstairs, which is what the Defendants' alternative facts
suggest.  See Response ¶¶ T-U, at 9.  The Court will therefore modify Wilson's asserted fact to
address the Defendants' dispute.

       [13]The Defendants dispute this fact and assert that Wilson left out important information about
the sequence of events.  See Response ¶ 20, at 4.  The Defendants do not dispute the substance of
the asserted fact.  Because the Court has included many of the Defendants' additional material facts,
it has addressed the Defendants' sequence of events concern.  Because the Defendants do not
specifically controvert the asserted fact, the Court will deem Wilson's asserted fact, that the
Defendants ordered T. Chabot downstairs and gave him no choice but to obey, is deemed admitted.
See D.N.M.LR-Civ. 56.1(b).

       [14]Wilson asserts that T. Chabot stepped deeper into the apartment and then the Defendants
reached across the threshold.  See Motion SJ ¶¶ 21-22, at 3.  The Defendants dispute the sequence
of these events and assert that they reached across the threshold before T. Chabot stepped backwards
further into the apartment.  See Response ¶¶ 21-22, at 4.  In Wilson's deposition, the following
exchange occurred:

       Q: Did the officers respond to that?

-11-

retreat physically pulled Vazquez into the apartment.  <u>See</u> Vazquez Depo. at 57:24-58:2; Motion SJ

> A: They just said, you know, "Stop interfering."  They demanded that he come out of the apartment.
>
> Q: So did Tim step out at all?
>
> A: No.  Tim didn't step out.  He backed up further and told them that he didn't feel comfortable talking to them downstairs.
> . . . .
>
> Q: So when Tim backed up, what happened?
>
> A: They entered the apartment.

Wilson Depo. at 50:4-10, 17-18.  In the Jara and Vazquez depositions that the Defendants cite, however, the order seems to be reversed.  Vazquez stated that, "[a]s I grabbed Timothy to escort him out, Timothy pulls back, pulling us both back into the apartment. . . ."  Vazquez Depo. at 57:24-25.  <u>See also</u> Vazquez Depo. at 58:1-12.  In Jara's deposition, there was also a discussion of the sequence of events:

> A: [I]n essence we[']re pulling him out of the apartment -- not pulling, but escorting, I will say, and then that's when she went hands on with Officer Vazquez.  We all ended up in the apartment because I remember Timothy pulling back, and then Officer Vazquez dealing with him, and then the couch being right there–
> . . . .
> Q: But you reached into the apartment?
>
> A: Correct.
>
> Q: And because Timothy was in the apartment?
>
> A: Yes

Jara Depo. at 71:21-72:2, 72:14-17.  Given the inconsistencies in the testimony about the sequence of events, the Court believes that there is a factual issue whether T. Chabot stepped back first, or whether Jara and Vazquez reached first.  Because the Court must construe the evidence in the light most favorable to the non-moving party, the Court will accept as true, for purposes of this motion, the assertion that Jara and Vazquez reached for T. Chabot, and then he stepped back further into the apartment.  <u>See</u> <u>Hunt v. Cromartie</u>, 526 U.S. at 551.

¶ 23, at 3 (setting forth this fact).[15]   Vazquez extended his arm out, making contact with Wilson's

person, to have her step back.  See Vazquez Depo. at 62:10-17; Motion SJ ¶ 24, at 3 (setting forth

this fact).[16]  Wilson objected to Jara and Vazquez' entry into her home.  See Wilson Depo. at 55:7-9;

Motion SJ ¶ 25, at 3 (setting forth this fact).[17]  Jara and Vazquez believed that there was a legal basis

to enter Wilson's apartment.  See Vazquez Depo. at 54:19-55:2, 80:1-81:25, 84:1-10, 85:22-25; Jara

---

[15]The Defendants dispute this fact, and assert that Wilson stood in front of Chabot as Jara and Vazquez reached for him, that Wilson grabbed Vazquez' arm, and that T. Chabot then pulled Jara and Vazquez involuntarily into the apartment.  See Response ¶¶ 23, W, at 4, 9.  Wilson cites to Vazquez' deposition, where he states: "As I grabbed Timothy to escort him out, Timothy pulls back, pulling us both into the apartment, and during that time, Martha Wilson had grabbed my arm." Vazquez Depo. at 57:24-58:2.  The Defendants cite Jara's deposition, where she states that while they were escorting T. Chabot out of the apartment, Wilson grabbed Vazquez, and "[w]e all ended up in the apartment because I remember Timothy pulling back."  Jara Depo. at 71: 21-25.  Although Vazquez states that Wilson grabbed his arm while T. Chabot was pulling back, Jara does not give a clear indication of the chronology of when they were pulled into the apartment.  Given the inconsistencies in the deposition testimony, the Court believes that there is a factual issue about the chronology of this contact.  Because the Court must construe the evidence in the light most favorable to the non-moving party, the Court will accept as true the Defendants' assertion that Wilson grabbed Vazquez first.  See Hunt v. Cromartie, 526 U.S. at 551.

[16]Wilson asserts that Vazquez pushed her away.  See Motion SJ ¶ 24, at 3 (citing Vazquez Depo. at 62:12-17).  The Defendants dispute the characterization of this contact as a push.  See Response ¶ 24, at 5 (citing Vazquez Depo. at 62:10-17).  The relevant portion of Vazquez' deposition, which both parties cite, states: "At this point Martha grabbed me.  I -- I extended my arm out to have her step back, told her to stay back and not touch me."  Vazquez Depo. at 62:12-14.  The deposition does not establish that this was a "push."  The Defendants have therefore partially controverted Wilson's asserted fact, and the Court will modify the asserted fact accordingly.

[17]The Defendants dispute that Wilson objected to their entry into her apartment and cite to Jara's Belt Tape.  See Response ¶ 25, at 5 (citing Jara's Belt Tape at 7:14-8:15).  In this section of the recording, there are several moments at which the female voice, Wilson, says something inaudible.  See Jara's Belt Tape at 8:6-21.  At one point on the recording, Wilson says: "Don't you dare (inaudible)."  Jara's Belt Tape at 8:16-17.  The Defendants did not point to any deposition testimony or affidavits stating that Wilson did not object to Jara and Vazquez' entry into her home.  Because there are inaudible portions of the tape, the Court cannot say that the Defendants specifically controverted Wilson's assertion that she objected; the Court will deem the asserted fact admitted.  See D.N.M.LR-Civ. 56.1.

Depo. at 41:10-24, 43:1-49:11; Response ¶ 28, at 5-6 (setting forth this fact).[18]

Police officers are on heightened alert with domestic violence calls because they are the type of incidents where an officer is most likely to be injured or killed.  See Vazquez Depo. at 78:6-21; Response ¶ X, at 10 (setting forth this fact).  Jara and Vazquez did not want to speak to T. Chabot at the top of the stairwell because of officer safety concerns about being pushed down or falling down the stairs.  See Vazquez Depo. at 78:22-25, 79:11-16; Response ¶ Y, at 10 (setting forth this fact).  Jara and Vazquez did not want to speak to T. Chabot in the doorway -- "the fatal funnel" -- because of officer safety concerns and because it is a confined space, difficult to seek cover, and left them exposed.  See Vazquez Depo. at 78:22-79:10; Response ¶ Z, at 10 (setting forth this fact).

After cuffing T. Chabot, Jara and Vazquez took him downstairs, and Jara told Wilson to

---

[18]Wilson asserts that Vazquez admitted that, when the officers threatened to go into the home to get T. Chabot, they had no legal basis to do so.  See Motion SJ ¶ 28, at 3 (citing Vazquez Depo. at 39:13-22, 45:10-13).  The Defendants dispute this assertion, and state that Jara and Vazquez believed that they had a legal basis to enter the home.  See Response ¶ 28, at 5-6 (citing Vazquez Depo. at 54:19-55:2, 80:1-81:25, 84:1-10, 85:22-25; Jara Depo. at 41:10-24, 43:1-49:11).  In the deposition, Vazquez initially agreed that, given the factual situation confronting him, he had no legal right to enter the apartment and retrieve T. Chabot, but later stated that he believed that the New Mexico Family Violence Protection Act, N.M.S.A. 1978, § 40-13-7, gave him the authority to enter the apartment.  See Vazquez Depo. at 39:13-22, 45:10-13; Vazquez Depo. at 80:1-81:25, 84:1-10, 85:22-25.  Given the inconsistencies in Vazquez' testimony, the Court concludes that there is a factual issue whether Vazquez believed that he had a legal basis to enter the apartment.  Although the factual dispute results from inconsistencies in the deposition testimony of the non-moving party, the "testimony reflects confusion" rather than a motive to create an issue of fact so as to avoid summary judgment.  Am. Commerce Ins. Co. v. Bachicha, 256 F.Supp. 2d 1219, 1222 (D.N.M. 2003)(Vazquez, J.)(holding that where a witness' testimony in his first deposition conflicted with a later affidavit and second deposition there was no reason to believe that the additional testimony reflected an improper purpose).  See DeSpain v. Uphoff, 264 F.3d 965, 972 n.1 (10th Cir. 2001)("Conflicts between . . . sworn testimony . . . are not automatic grounds for disregarding" part of the testimony unless the record suggests that the subsequent testimony was introduced "merely to create a 'sham fact issue' for purposes of summary judgment.").  Because the Court must construe the evidence in the light most favorable to the non-moving party, the Court will accept as true the Defendants' assertion that Vazquez believed he had the authority to enter Wilson's apartment.  See Hunt v. Cromartie, 526 U.S. at 551.

-14-

remain upstairs and not to follow them or that she too would be arrested.  <u>See</u> Markel Depo. at 26:15-27:25; Jara Depo. at 74:1-76:12; Response ¶ AA, at 10 (setting forth this fact).  Wilson ignored Jara's request to not follow them downstairs.  <u>See</u> Jara Depo. at 73:17-75:12; Markel Depo. at 26:15-28:13, 36:17-21; Response ¶ BB, at 10 (setting forth this fact).

Wilson grabbed Vazquez again, and Vazquez again made physical contact with her in an attempt to create space.  <u>See</u> Wilson Depo. at 55:23; Motion SJ ¶ 26, at 3 (setting forth this fact); Vazquez Depo. at 62:12-17; Vazquez Depo. at 63:1-19; Response ¶ 26, at 5 (setting forth this fact).[19] Neighbors were being disturbed and came outside because of Wilson's and T. Chabot's conduct.  <u>See</u> L.'s 911 Call at 1-2; D.'s 911 Call at 2-4; Jara Depo. at 18-24; Markel Depo. at 24:1-25:25; Response ¶ CC, at 10 (setting forth this fact).  Wilson continued to disobey police orders.  <u>See</u> Jara Depo. at 76:14-77:25; Jara Depo. at 78:1-17.  Jara arrested Wilson for battery on a police officer, disorderly conduct, and resisting arrest/obstructing justice.  <u>See</u> Jara Depo. at 76:1-8; Motion SJ ¶ 27, at 3 (setting forth this fact).[20]

## PROCEDURAL BACKGROUND

---

[19] Wilson again asserts that Vazquez pushed her.  <u>See</u> Motion SJ ¶ 26, at 5.  The Defendants dispute the characterization of this contact as a push.  <u>See</u> Response ¶ 24, at 5.  The Jara and Vazquez depositions cited by the Defendants demonstrate that Wilson grabbed Vazquez first and then Vazquez made contact with Wilson.  <u>See</u> Vazquez Depo. at 62:12-14; Jara Depo. at 63:1-19. Given the inconsistencies in the testimony between Wilson and the Defendants, the Court believes that there is be a factual issue whether Vazquez pushed Wilson.  Because the Court must construe the evidence in the light most favorable to the non-moving party, the Court will accept as true, for purposes of this motion, the Defendants' assertion that Vazquez was attempting to create space after Wilson grabbed him.  <u>See</u> Hunt v. Cromartie, 526 U.S. at 551.

[20]The Defendants dispute this statement and assert that Wilson does not follow the correct sequence of events.  The Court has, however, deemed admitted the Defendants' additional material facts, and the Defendants' additional facts correct any perceived defect in chronology.  Because the Defendants do not object to the substance of the asserted statement or direct the court to any evidence controverting the statement, the Court will deem the statement admitted.  <u>See</u> D.N.M.LR-Civ. 56.1(b).

Wilson and T. Chabot, filed the Complaint in the Second Judicial District, Bernalillo County, State of New Mexico, on July 15, 2010. <u>See</u> Complaint to Recover Damages for Deprivation of Civil Rights (dated July 15, 2010), filed August 25, 2010 (Doc. 1-1)("Complaint"). She brought suit under 42 U.S.C. § 1983 and alleges: (i) Arrest and Prosecution Without Probable Cause (Count I); (ii) Fourth Amendment Claim for Excessive Use of Force (Count II); and (iii) Fourth Amendment Claim for Warrantless Arrest in Home and Unlawful Entry Into Home (Count III). <u>See</u> Complaint ¶¶ 22-23, 28, 33, at 3-5. On August 25, 2011, the Defendants removed the case to federal court pursuant to 28 U.S.C. § 1331 federal-question jurisdiction. <u>See</u> Notice of Removal ¶ 6, at 2, filed August 25, 2011 (Doc. 1). After removing the case, the Defendants filed Defendants' Answer to Plaintiffs' Complaint, filed August 26, 2011 (Doc. 6)("Answer"). The Defendants denied the Plaintiffs' claims, and asserted that: (i) they are entitled to qualified immunity; (ii) the Plaintiffs or third persons caused the Plaintiffs' injuries; (iii) the arrest-without-warrant provision of N.M.S.A. 1978, § 31-1-7 shields them from liability; and (iv) the Family Violence Protection Act, bars one or more of the Plaintiffs' claims. <u>See</u> Answer at 3-6.

On July 6, 2011, Wilson moved for summary judgment on Count III of her Complaint, in which she seeks damages as a result of an unlawful in-home detention and arrest. <u>See</u> Motion SJ at 1. Wilson alleges that the Defendants seized her in her home, acted in excess of their authority, conducted a search when they reached across the threshold of the Wilson home to arrest T. Chabot, and acted without probable cause. <u>See</u> Motion SJ at 4-7. On July 27, 2011, the Defendants responded and asserted qualified immunity as well as immunity under the Family Violence Protection Act. <u>See</u> Response at 11, 23. The Defendants argue that Jara and Vazquez' actions constituted a threshold arrest, and not an unlawful entry. <u>See</u> Response at 12-15. The Defendants also contend that their request to Wilson was not a seizure, that they had probable cause to seize

Wilson, and that there were exigent circumstances to enter the home.  See Response at 12-23.

On October 4, 2011, the Court held a hearing on Wilson's Motion for Summary Judgment. At the hearing, T. Chabot's attorney informed the Court that T. Chabot is no longer pursuing his claims and that Wilson's claims are the only claims remaining before the Court.  See  Transcript of Hearing at 39:10-16 (October 4, 2011)(Court, Kennedy)("Tr.").[21]  Wilson argued that the conversation with Jara and Vazquez at the threshold of her home evolved into a seizure, because "the officers conveyed a message to her that compliance with their request was required."  Tr. at 4:15-5:8 (Kennedy).  Wilson contends that under the standard articulated in Florida v. Bostick, 501 U.S. 429 (1991), the encounter became a seizure at the moment the officers gave the order "go get your son or we will be getting him for you," which Wilson was not at liberty to ignore.  Tr. at 4:15-5:8 (Kennedy).  Wilson asserted that an unconstitutional search took place when Jara and Vazquez reached "across the doorway to pull Plaintiff's [son] . . . from the inside of his home outside."  Tr. at 5:9-15, 9:9-22 (Kennedy).  Relying on Jara's deposition, Wilson stated that it was undisputed that T. Chabot never left the apartment.  See Tr. at 5:18-6:10 (Court, Kennedy).  In response to legal arguments that the Defendants raised in their Response, Wilson argued that the controlling authorities for a threshold arrest are Payton v. New York, 445 U.S. 573 (1980), and McClish v. Nugent, 483 F.3d 1231 (11th Cir. 2007), and that Jara and Vazquez were on notice that "to reach across the threshold of a home is . . . an unlawful search" as of 2007.  Tr. at 6:17-7:25 (Kennedy). Responding to the Court's question, Wilson stated that she did not believe that the Defendants disputed any material facts in their Response and that several of their facts, including that they ordered Wilson to go get her son, support Wilson's motion.  See Tr. at 10:15-11:24 (Kennedy).

---

[21]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any finalized transcript may contain slightly different page and/or line numbers.

The Defendants argued that the request that Wilson retrieve her son was not compulsory. See Tr. at 12:13-19 (Hoden).  They assert that Wilson had an option "Ma'am if you don't go get your son then we'll go get your son" and that they had no intent to seize Wilson.  Tr. at 12:13-19 (Hoden).  The Defendants conceded that it is undisputed that Jara and Vazquez said "you either produce your son or we're going to come in."  Tr. at 13:5-9 (Court, Hoden).  The Defendants also agreed that, to anyone listening to that statement, it would be a police order.  See Tr. at 14:22-25 (Court, Hoden).  Later in the hearing, the Defendants clarified their position on whether it was an order, they explained that it looks like an order "if you're looking at that one particular portion of the sentence," but that, looking at the totality of the circumstances, Wilson "felt she had the right to, obviously, argue with police, because she continued to do it."  Tr. at 18:25-19:8 (Hoden). Relying on United States v. Abdenbi, 361 F.3d 1282 (10th Cir. 2004), the Defendants argued that the request to Wilson was not a seizure.  See Tr. at 15:3-14 (Hoden).  The Defendants also asserted that it was their position that Wilson "was free to disregard that order" and that "she was free to ignore it because she was not seized."  Tr. at 15:17-24, 16:18-23 (Court, Hoden).  The Defendants assert that, for a seizure to occur, "[t]hey . . . would [need to] tell her that she was going to be seized and . . . asserted some sort of physical control over her."  Tr. 17:1-3 (Hoden).

The Defendants also disputed that a search occurred, arguing that a valid "threshold arrest" took place.  Tr. 20:9-10 (Hoden).  They asserted that, when an arrest is initiated at the doorway, even if it continues further into the home, it is valid.  See Tr. at 20:15-21:4 (Court, Hoden).  Although the Defendants agreed that the general rule is that a warrantless arrest cannot take place in a home even if there is probable cause, they asserted that, when a person comes to the door, and into public view, it is no longer considered an arrest in the home.  See Tr. at 21:12-22:1 (Court, Hoden).  The Defendants also contended that Payton v. New York, was distinguishable on its facts because there

the police pried open the door to the home with a crowbar.  See Tr. at 22:13-25 (Hoden).

Addressing Wilson's arrest, the Defendants asserted that Wilson disregarded police orders, was in Jara's face, and was "almost chesting her."  Tr. 24:12-20 (Hoden).  When asked to turn around so that Jara could arrest her, the Defendants argue that Wilson continued to resist and refused to turn around.  See Tr. 24:18-20 (Hoden).  The Defendants contended that there were officer safety issues which could create exigent circumstances, because this was a domestic violence call.  See Tr. at 33:3-12, 34:4-9 (Court, Hoden).  They also asserted that whether H. Chabot was returning to the apartment is a material fact which is disputed and goes to whether exigent circumstances exist.  See Tr. at 34:21-35:1 (Hoden).  Responding to a question whether a finding of an unconstitutional seizure would taint the arrest, the Defendants asserted that the standard is "whether she was reasonably protesting" and contended that it is unreasonable "to be physically grabbing at the officers . . . she was doing this multiple times."  Tr. 24:21-25:12 (Court, Hoden).  Finally, the Defendants argued that Wilson "is basically trying to argue . . . the propriety of the Fourth Amendment rights of the son as opposed to her own rights."  Tr. 25:15-23 (Hoden).

Wilson asserts that the Defendants are requesting that the Court find an "open door exception" to the warrant requirement and that the caselaw does not support such a rule.  Tr. at 27:6-14 (Kennedy).  Arguing that there is a clearly established violation of Fourth Amendment rights in this case, Wilson distinguishes McKinnon v. Carr, 103 F.3d 934 (10th Cir. 1996), to which the Defendants cite, because in that case, the defendant acquiesced to the police officers entering his home.  See Tr. at 28:5-14 (Kennedy).  Wilson also contended that there is a link between the unconstitutional seizure and the unconstitutional arrest, arguing that but for Jara and Vazquez' unlawful conduct, Wilson would not have been put in a place where she had to assert her constitutional right.  See Tr. 30:18-31:10 (Kennedy).  Wilson stated that the reasonableness of her

protest of the constitutional violations is a question of law.  See Tr. at 32:6-12 (Court, Kennedy).

Addressing the Defendants' exigent circumstances argument, Wilson asserted that there is no

warrant exception for what might happen in the future and that whether H. Chabot was going to

return to the apartment is immaterial.  See Tr. 35:10-36:8 (Kennedy).  Additionally, Wilson stated

that the Defendants are arguing a "generalized officer safety" exigent circumstance, which Wilson

contends would "completely obliterate the Fourth Amendment."  Tr. 36:9-10 (Kennedy).

Because Wilson did not file a Reply in this case, the Court asked whether Wilson disputed

the additional facts that the Defendants added in their response.  See Tr. 36:24-37:2 (Kennedy).

Wilson replied that she did not dispute the Defendants' additional facts and did not consider them

material.  See Tr. at 36:24-37:13 (Court, Kennedy).

## LEGAL STANDARD FOR MOTIONS FOR SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure states that summary judgment "should

be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show

that there is no genuine issue as to any material fact and that the movant is entitled to judgment as

a matter of law."  Fed. R. Civ. P. 56(c)(2).  The movant bears the initial burden of "show[ing] that

there is an absence of evidence to support the nonmoving party's case."  Bacchus Indus., Inc. v.

Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)(internal quotation marks omitted).  See

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the movant meets this burden, rule 56(e)

requires the non-moving party to designate specific facts showing that there is a genuine issue for

trial.  See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

256 (1986).

The party opposing a motion for summary judgment must "set forth specific facts showing

that there is a genuine issue for trial as to those dispositive matters for which it carries the burden

of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir.

1990). See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving

party may not rest on its pleadings but must set forth specific facts showing that there is a genuine

issue for trial as to those dispositive matters for which it carries the burden of proof.")(internal

quotation marks omitted).   Rule 56 provides that "an opposing party may not rely merely on

allegations or denials in its own pleading; rather, its response must -- by affidavits or as otherwise

provided in this rule -- set out specific facts showing a genuine issue for trial." Fed. R. Civ. P.

56(e)(2).  It is not enough for the party opposing a properly supported motion for summary judgment

to "rest on mere allegations or denials of his [or her] pleadings." Anderson v. Liberty Lobby, Inc.,

477 U.S. at 256.   See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990);

Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("However, 'once a properly supported

summary judgment motion is made, the opposing party may not rest on the allegations contained

in his complaint, but must respond with specific facts showing the existence of a genuine factual

issue to be tried.'")(citation omitted).   Nor can a party "avoid summary judgment by repeating

conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins.

Co. v. Omer, No. 07-2123, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(citing Fed. R. Civ. P.

56(e); Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)).  "In

responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on

speculation, or on suspicion and may not escape summary judgment in the mere hope that something

will turn up at trial.'" Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway

v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

Genuine factual issues must exist that "can be resolved only by a finder of fact because they

may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. at

250.  A mere "scintilla" of evidence will not avoid summary judgment.  Vitkus v. Beatrice Co., 11

F.3d 1535, 1539 (10th Cir. 1993)(citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 248).  Rather,

there must be sufficient evidence on which the fact-finder could reasonably find for the nonmoving

party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill & Dauphin Improv.

Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539.  "[T]here is no

evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to

return a verdict for that party.  If the evidence is merely colorable . . . or is not significantly

probative, . . . summary judgment may be granted."  Anderson v. Liberty Lobby, Inc., 477 U.S. at

249 (citations omitted).  Where a rational trier of fact, considering the record as a whole, could not

find for the non-moving party, there is no genuine issue for trial.  See Matsushita Elec. Indus. Co.

v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind three

principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue

whether a genuine issue exists as to material facts requiring a trial.  See Anderson v. Liberty Lobby,

Inc., 477 U.S. at 249.  Second, the court must resolve all reasonable inferences and doubts in favor

of the non-moving party, and construe all evidence in the light most favorable to the non-moving

party.  See Hunt v. Cromartie, 526 U.S. at 550-55; Anderson v. Liberty Lobby, Inc., 477 U.S. at 255

("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn

in his favor.").  Third, the court cannot decide any issues of credibility.  See Anderson v. Liberty

Lobby, Inc., 477 U.S. at 255.

## LAW REGARDING 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code provides:

Every person who, under color of any statute, ordinance, regulation, custom, or

usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. Section 1983 creates only the right of action; it does not create any substantive rights; substantive rights must come from the United States Constitution or from federal statute. See Spielman v. Hildebrand, 873 F.2d 1377, 1386 (10th Cir.1989)("Section 1983 does not provide a remedy if federal law does not create enforceable rights."). Rather, § 1983 authorizes an injured person to assert a claim for relief against a person who, acting under color of state law, violated the claimant's federally protected rights. Thus, to state a claim upon which relief can be granted under § 1983, a plaintiff

must establish (1) a violation of rights protected by the federal Constitution or created by federal statute or regulation, (2) proximately caused (3) by the conduct of a "person" (4) who acted under color of any statute, ordinance, regulation, custom[,] or usage, of any State or Territory or the District of Columbia.

Martinez v. Martinez, No. 09-0281, 2010 WL 1608884, at *11 (D.N.M. March 30, 2010)(Browning, J.)(quoting Summum v. City of Ogden, 297 F.3d 995, 1000 (10th Cir. 2002)). Neither the civil-rights statutes nor the Fourteenth Amendment, however, are a license to the federal judiciary to displace state law through the creation of a body of general federal tort law. See Paul v. Davis, 424 U.S. 693, 701 (1976)(Fourteenth Amendment); Griffin v. Breckenridge, 403 U.S. 88, 101–02 (1971)(civil-rights statute).

Section 1983 provides a cause of action only for violations of a plaintiff's personal rights and not for the rights of someone else. See Archuleta v. McShan, 897 F.2d 495, 497 (10th Cir. 1990). Historically, the guarantee of due process has been applied to deliberate decisions of government officials to deprive a person of life, liberty, or property. See Archuleta v. McShan, 897 F.2d at 497

-23-

(quoting <u>Daniels v. Williams</u>, 474 U.S. 327, 331 (1986)).  Moreover, the element of deliberateness requires directing of the misconduct toward the plaintiff before the Due Process Clause is implicated.  <u>See Archuleta v. McShan</u>, 897 F.2d at 499.  In <u>Archuleta v. McShan</u>, the Tenth Circuit used the term "bystander" to refer to someone who witnessed a police action, but who is not himself or herself part of the action.  As such, a bystander is unable to assert the kind of deliberate deprivation of his or her rights necessary to state a due-process claim under § 1983.  <u>See</u> <u>also</u> <u>Grandstaff v. City of Borger</u>, 767 F.2d 161, 172 (5th Cir. 1985)(holding that a rancher's wife and stepsons who witnessed a mistaken shooting of the rancher by police had no constitutional claim for their own emotional injuries under § 1983, because there is no constitutional right to be free from witnessing this police action); <u>Coon v. Ledbetter</u>, 780 F.2d 1158, 1160-61 (5th Cir. 1986)(holding that the wife who witnessed sheriff's deputies shooting into her mobile home had no constitutional claim for emotional injuries, because the deputies' action was not directed towards her).

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." <u>Harlow v. Fitzgerald</u>, 457 U.S. at 807.  "Qualified immunity protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'" <u>Roybal v. City of Albuquerque</u>, No. 08-0181, 2009 WL 1329834, at *10 (D.N.M. Apr. 28, 2009)(Browning, J.)(quoting <u>Siegert v. Gilley</u>, 500 U.S. 226, 232 (1991)).  Issues of qualified immunity are best resolved at the "earliest possible stage in litigation." <u>Pearson v. Callahan</u>, 129 S.Ct. 808, 815 (2009)(quoting <u>Hunter v. Bryant</u>, 502 U.S. 224, 227 (1991)(per curiam)).

Qualified immunity shields government officials from liability where "their conduct does

not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 129 S.Ct. at 815 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). When a defendant asserts qualified immunity at summary judgment, the responsibility shifts to the plaintiff to meet a "heavy two-part burden." Medina v. Cram, 252 F.3d 1124, 1128 (10th Cir. 2001). The plaintiff must demonstrate on the facts alleged: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged unlawful activity. See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009).

In evaluating whether the right was clearly established, the court considers whether the right was sufficiently clear that a reasonable government employee in the defendant's shoes would understand that what he did violated that right. See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007). A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be "indisputable" and "unquestioned." Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983), cert. denied, 469 U.S. 880 (1984). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001). See Medina v. City & Cnty. of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992). On the other hand, the Supreme Court of the United States has observed that it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful." Anderson v. Creighton, 483 U.S. 635, 640 (1987). "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that

a reasonable official would understand that what he is doing violates that right.'" Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1186 (10th Cir. 2001)(quoting Saucier v. Katz, 533 U.S. at 202).

The Supreme Court recently revisited the proper procedure for lower courts to evaluate a qualified-immunity defense.  In Pearson v. Callahan, the Supreme Court held that lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." 129 S.Ct. at 821.  The Supreme Court also noted in Pearson v. Callahan that, while no longer mandatory, the protocol outlined in Saucier v. Katz will often be beneficial.  See 129 S.Ct. at 821.  Once the plaintiff has established the inference that the defendant's conduct violated a clearly established constitutional right, a qualified immunity defense generally fails.  See Cannon v. City & Cnty. of Denver, 998 F.2d 867, 870-71 (10th Cir. 1993).

## LAW REGARDING THE FOURTH AMENDMENT

The Fourth Amendment to the United States Constitution "protects '[t]he right of the people to be secure in their person, houses, papers, and effects, against unreasonable searches and seizures.'" United States v. Thompson, 524 F.3d 1126, 1132 (10th Cir. 2008)(quoting U.S. Const. amend. IV).  It also commands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.  "The security of one's privacy against arbitrary intrusion by the police -- which is at the core of the Fourth Amendment -- is basic to a free society." Wolf v. Colorado, 338 U.S. 25, 27 (1949), overruled on other grounds by Mapp v. Ohio, 367 U.S. 643 (1961).

1.      **Requirements for Fourth Amendment Seizures and Arrests**.

For purposes of analyzing Fourth Amendment seizures, the Tenth Circuit has divided interactions between police and citizens into three categories: (i) consensual encounters; (ii) investigative stops; and (iii) arrests.  See Oliver v. Woods, 209 F.3d 1179, 1186 (10th Cir. 2000). A consensual encounter occurs when a police officer approaches a person to ask questions under circumstances where a reasonable person would feel free to refuse to answer and to end the encounter.  See Oliver v. Woods, 209 F.3d at 1186.  For example, officers generally may "go to a person's home to interview him," United States v. Daoust, 916 F.2d 757, 758 (1st Cir. 1990), because "[i]t is not improper for a police officer to call at a particular house and seek admission for the purpose of investigating a complaint or conducting other official business,"  1 W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.3(b), at 475 (3d ed. 1996).  Such encounters generally "are not seizures within the meaning of the Fourth Amendment, and need not be supported by suspicion of criminal wrongdoing."  Oliver v. Woods, 209 F.3d at 1186.

a.      **Requirements for Seizures**.

In United States v. Reeves, 524 F.3d 1161 (10th Cir. 2008), the Tenth Circuit established that "[o]pening the door to one's home is not voluntary if ordered to do so under color of authority." 524 F>3d at 1167.  The Tenth Circuit has repeatedly held that, absent exigent circumstances, officials acting under the color of authority and without a warrant may not seize a person inside their home, or effect a seizure by ordering a person inside a home to come to the door.  See United States v. Maez, 872 F.2d 1444, 1446 (10th Cir. 1989)(holding a seizure to have been a violation of the Fourth Amendment when police surrounded an individual's house for three hours planning an arrest and ordering the individual out of his home under drawn firearms believing he was a suspect in a bank robbery); United States v. Flowers, 336 F.3d 1222, 1225-27 (10th Cir. 2003)(holding that an

unconstitutional seizure occurred when police discovered that a suspect illegally sold alcohol from his home and that ordering him to open the door to be arrested inside his home was not a voluntary act by the defendant).   In United States v. Reeves, police officers suspected an individual of unlawfully carrying weapons.  See 524 F.3d at 1163.  Without an arrest or search warrant, officers had convened at the suspect's motel and made several calls from the front office to the motel room, which were unanswered.  After assessing the situation, officers proceeded knocking on the suspect's door and windows.  See United States v. Reeves, 524 F.3d at 1164.  After nearly twenty-five minutes, the suspect met the officers at the door and was promptly arrested.  See United States v. Reeves, 524 F.3d at 1164.  The Tenth Circuit, in United States v. Reeves, held that the presence of police, the telephone calls, and the knocking at door constituted a seizure inside the home, because the suspect would not likely have thought that he was free to ignore the officers knocking and yelling into the room.  See 524 F.3d at 1168. Although it recognized that the officers in United States v. Reeves did not issue any direct commands for the suspect to open the door or come out, the Tenth Circuit reasoned:

> [T]he officers' actions were effectively a command to open the door.  The record demonstrates that three officers pounded on Reeves' door and window while yelling and loudly identifying themselves as police officers. They continued this conduct consistently for at least twenty minutes.  This encounter began between 2:30 and 3:00 in the morning, a time which must be taken into consideration when analyzing the coerciveness of the encounter.

United States v. Reeves, 524 F.3d at 1168-69.

The Court, in Smith v. Kenny, 678 F.Supp. 2d 1124 (D.N.M. 2009)(Browning, J.), held that citizens could be seized when an officer issues a command, via cellular phone, to someone to leave his or her home and surrender to officers waiting outside.  See 678 F.Supp. 2d at 1173 (holding that a seizure could occur under these facts, but not deciding this issue because of factual disputes).  The

Court determined that the late hour in addition to the direct order to exit the home and surrender to police custody "is a seizure because a reasonable person would not fee free to ignore the order." 678 F.Supp. 2d at 1173. The Court found that the means of communication are not the focus of the Fourth Amendment analysis and that it is the arrested person's location that determines whether an arrest occurs in a home. See Smith v. Kenny, 678 F.Supp. 2d at 1174.

In United States v. Reeves, the Tenth Circuit cited with approval a case from the United States Court of Appeals for the Ninth Circuit. In that case, United States v. Al-Azzawy, 784 F.2d 890 (9th Cir. 1985), the Ninth Circuit held that a defendant was seized inside his home for purposes of the Fourth Amendment when officers surrounded his trailer and used a bullhorn to order the suspect to exit his home and drop to his knees. See United States v. Al-Azzawy, 784 F.2d at 893. The Ninth Circuit had found that the defendant/appellee "was not free to leave, his freedom of movement was totally restricted, and the officers' show of force and authority was overwhelming. Any reasonable person would have believed he was under arrest in these circumstances." United States v. Al-Azzawy, 784 F.2d at 893.

The Tenth Circuit in United States v. Reeves also cited with approval United States v. Morgan, 743 F.2d 1158 (6th Cir. 1984). In United States v. Morgan, the United States Court of Appeals for the Sixth Circuit held that a seizure occurred when police surrounded a defendant's home and demanded that he come outside:

> [T]he record provides ample proof that, as a practical matter, Morgan was under arrest as soon as the police surrounded the Morgan home, and therefore, the arrest violated Payton because no warrant had been secured. The police show of force and authority was such that a reasonable person would have believed he was not free to leave.

743 F.2d at 1163-64.

In United States v. Johnson, 626 F.2d 753 (9th Cir. 1980), federal agents approached the

-29-

home of a suspect to investigate the theft of a treasury check. <u>See</u> 626 F.2d at 755. The suspect's seizure occurred when the suspect was inside the house and the officers were outside with guns drawn. <u>See United States v. Johnson</u>, 626 F.2d at 757. The Ninth Circuit held that this arrest was unconstitutional, because "it is the location of the arrested person and not the arresting agents that determines whether an arrest occurs within a home." <u>United States v. Johnson</u>, 626 F.2d at 757. The Ninth Circuit reasoned that to hold otherwise would allow officers to "avoid illegal 'entry' into a home simply by remaining outside the doorway and controlling the movements of suspects within through the use of weapons that greatly extend the 'reach' of the arresting officers." 626 F.2d at 757.

The Supreme Court has found "a person has been seized within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave." <u>United States v. Mendenhall</u>, 446 U.S. 544, 554 (1980). However, "in situations where the individual could not or would not want to leave, even absent police presence, the appropriate inquiry is whether a reasonable person would feel free to decline the officer's requests." <u>Florida v. Bostick</u>, 501 U.S. 429, 436 (1991). Regarding circumstances where police officers, without warrant or exigent circumstances and acting under the color of authority, order the occupants of an residence to the door to be seized, the Tenth Circuit has stated:

> In situations where the individual could not or would not wish to leave, even absent the police presence, "the appropriate inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." <u>Florida v. Bostick</u>, 501 U.S. 429, 436 . . . (1991). Circumstances that indicate a seizure include: "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." <u>[United States v.] Mendenhall</u>, 446 U.S. [544,] 554 . . . [(1980)]; <u>[United States v.] Maez</u>, 872 F.2d [1444,] 1450 [(1989)].

United States v. Reeves, 524 F.3d at 1167.

> **b.**     **Requirements for an Arrest.**

Probable cause must support an arrest, "characterized by highly intrusive or lengthy search or detention. Oliver v. Woods, 209 F.3d 1179, 1185 (10th Cir.2000). See Tennessee v. Garner, 471 U.S. 1, 7 (1985). "Probable cause to arrest exists only when the 'facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.'" United States v. Valenzuela, 365 F.3d 892, 896-97 (10th Cir. 2004)(quoting United States v. Edwards, 242 F.3d 928, 934 (10th Cir. 2001))(citing Draper v. United States, 358 U.S. 307, 313 (1959)). Although "[p]robable cause does not require facts sufficient for a finding of guilt . . . , it does require more than mere suspicion." United States v. Morris, 247 F.3d 1080, 1088 (10th Cir. 2001)(internal quotation marks omitted). The Supreme Court has made the following distinction between reasonable suspicion, which is sufficient for an investigatory stop under Terry v. Ohio, 392 U.S. 1 (1968), and probable cause, which is required before an arrest can be made:

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

Alabama v. White, 496 U.S. 325, 330 (1990).

Probable cause is measured against an objective standard. See Beck v. Ohio, 379 U.S. 89, 96 (1964). "The subjective belief of an individual officer as to whether there was probable cause for making an arrest is not dispositive." United States v. Valenzuela, 365 F.3d at 896-97 (citing Florida v. Royer, 460 U.S. 491, 507 (1983); United States. v. Treto-Haro, 287 F.3d 1000, 1006 (10th

Cir. 2002)).  Thus, the primary consideration is "whether a reasonable officer would have believed that probable cause existed to arrest the defendant based on the information possessed by the arresting officer." Olsen v. Layton Hills Mall, 312 F.3d 1304, 1312 (10th Cir. 2002)(alterations omitted)(internal quotation marks omitted).

### 2.      Requirements for Fourth Amendment Searches.

"[T]he Fourth Amendment protects people, not places," and the Supreme Court has vigorously asserted that the proper analysis under the Fourth Amendment is not whether the place searched is a "constitutionally protected area." Katz v. United States, 389 U.S. 347, 351 (1967). The proper inquiry is whether the defendant had an expectation of privacy in the place searched and whether that expectation was objectively reasonable.  See Katz v. United States, 389 U.S. at 351 ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.  But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected."); Katz v. United States, 389 U.S. at 361 (Harlan, J., concurring)("My understanding of the rule that has emerged from prior decisions is that there is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'").

There is no doubt, however, that a citizen has a reasonable expectation of privacy, and a particularly strong one, in his own home.  The "chief evil" from which the Fourth Amendment protects citizens is unwanted police entry into the home, and the "principal protection" is "the Fourth Amendment's warrant requirement." United States v. Thompson, 524 F.3d at 1132.  See Kyllo v. United States, 533 U.S. 27, 31 (2001)("'At the very core' of the Fourth Amendment 'stands the right of a man to retreat into his own home and there be free from unreasonable governmental

intrusion.'")(quoting Silverman v. United States, 365 U.S. 505, 511 (1961)); Payton v. New York, 445 U.S. 573, 586 (1980)("[S]earches and seizures inside a home without a warrant are presumptively unreasonable.").

        **a.**      **Warrantless Searches: Limited Fourth-Amendment Exceptions.**

Not all searches require a warrant.  The Supreme Court has instructed that, when assessing the reasonableness of a warrantless search, a court must begin "with the basic rule that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions.'"  Arizona v. Gant, 129 S.Ct. 1710, 1716 (2009)(citing Katz v. United States, 389 U.S. at 357).  See Payton v. New York, 445 U.S. at 586.  As the Tenth Circuit stated in United States v. Cos, 498 F.3d 1115 (10th Cir. 2007): "A warrantless search of a suspect's home is per se unreasonable under the Fourth Amendment unless the government can show that it falls within 'one of a carefully defined set of exceptions.'"  498 F.3d at 1123 (quoting Coolidge v. New Hampshire, 403 U.S. 443, 474 (1971)).  See United States v. Thompson, 524 F.3d at 1132.

"One exception to the warrant requirement is when police reasonably believe an emergency exists that makes it infeasible to obtain a warrant."  United States v. Gambino-Zavala, 539 F.3d 1221, 1225 (10th Cir. 2008).  "The government bears the burden of proving the exigency exception to the warrant requirement applies."  United States v. Najar, 451 F.3d 710, 717 (10th Cir. 2006)(citing United States v. Wicks, 995 F.2d 964, 970 (10th Cir. 1993)).  "That burden is especially heavy when the exception must justify the warrantless entry of a home."  United States v. Najar, 451 F.3d at 717 (citation omitted).  Generally, a warrantless entry under the exigent-circumstances exception requires probable cause and exigent circumstances.  See Kirk v. Louisiana, 536 U.S. 635, 638 (2002); Manzanares v. Higdon, 575 F.3d 1135, 1142-43 (10th Cir. 2009).  The Tenth Circuit,

however, appears to have recognized a subset of exigent-circumstances cases -- what the Court refers to as "emergency-aid" cases -- that do not require probable cause. See United States v. Najar, No. 03-0735, 2004 WL 3426123, at *6 (D.N.M. Sept. 3, 2004)(Browning, J.)("For probable cause in the usual [evidence-of-crime] sense not to be needed, the police must be responding to a true emergency rather than a crime, and the police must reasonably believe a person inside needs immediate assistance, and entry is needed to protect or preserve life, or to avoid serious injury.")(alteration original), aff'd, 451 F.3d 710 (10th Cir. 2006)).  In the Tenth Circuit's opinion in United States v. Najar, the Tenth Circuit held that the exigent-circumstances exception to the warrant requirement authorized a warrantless police entry in an emergency-aid situation without a showing of probable cause.  In so doing, the Tenth Circuit noted that the Supreme Court in Brigham City, Utah v. Stuart, which was determining "whether the risk of personal danger created exigent circumstances," did not "require probable cause in this type of exigent circumstances."  United States v. Najar, 451 F.3d at 718 (emphasis added).

In such emergency-aid situations, the Tenth Circuit employs a two-pronged test to determine whether emergency circumstances justify a warrantless entry into a home, which examines: "whether (1) the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable."  United States v. Najar, 451 F.3d at 717-18.  A court is "guided by the realities of the situation presented by the record," and should consider the facts from the viewpoint of "prudent, cautious, and trained officers."  United States v. Porter, 594 F.3d 1251, 1258 (10th Cir. 2010)(citation omitted).  "Reasonable belief does not require absolute certainty; the standard is more lenient than the probable cause standard."  United States v. Porter, 594 F.3d at 1258 (citation omitted).  "Officers do not need ironclad proof of 'a likely serious, life-threatening' injury to invoke

-34-

the emergency aid exception." United States v. Porter, 594 F.3d at 1258 (citation omitted).  A court must also, however, remember that officers cannot create their own exigent circumstances to justify a warrantless entry.  See United States v. Flowers, 336 F.3d at 1230.  In the limited circumstances where the risk of danger to the officers or others gives rise to the exigent circumstance, the court does not require a separate showing of probable cause.  See United States v. Najar, 451 F.3d at 718.

**3.      Fourth-Amendment Protections and the "Threshold" of a Home.**

A warrantless arrest of an individual in a public place upon probable cause does not violate the Fourth Amendment.  See United States v. Watson, 423 U.S. 411, 418-19 (1976).  The Supreme Court has also held that when a warrantless arrest is in initiated at the doorway of a home and the individual retreats into the home, the warrantless arrest is valid.  See United States v. Santana, 427 U.S. 38, 41-42 (1976).  The open doorway in United States v. Santana was considered a "public" place for purposes of the Fourth Amendment.  427 U.S. at 42.  When an individual is "not merely visible to the public but [is] exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house" a warrantless arrest is permissible.  United States v. Santana, 427 U.S. at 42 (citing Hester v. United States, 265 U.S. 57, 65 (1924)).

The Tenth Circuit, in McKinnon v. Carr, 103 F.3d 934 (10th Cir. 1996), upheld a warrantless arrest when police officers knocked on an individual's door, the individual voluntarily answered the door, and arrested him in the threshold of his home.  See 103 F.3d at 935-36.  The Tenth Circuit noted that the district court did not err in holding that the arrest at the doorway was not invalid.  See McKinnon v. Carr, 103 F.3d at 935-36.

When an individual does not voluntarily come to the door, however, the Tenth Circuit has distinguished McKinnon v. Carr.  In United States v. Flowers, 336 F.3d 1222, the defendant -- Flowers -- was selling wine out of his home, and exposed his hand and arm through a panel in the

front door to the officers to sell them a bottle.  See 336 F.3d at 1224.  The officers then ordered

Flowers to open the door, he did, and they took Flowers into custody.  See United States v. Flowers,

336 F.3d at 1224.  Looking at these facts, the Tenth Circuit distinguished McKinnon v. Carr and

United States v. Santana, finding that "Flowers was not in a place sufficiently public that he had no

legitimate expectation of privacy."  United States v. Flowers, 336 F.3d at 1228.  In United States v.

Reeves, the Tenth Circuit reiterated that "opening the door to one's home is not voluntary if ordered

to do so under color of authority" and that opening the door under police orders does not diminish

an individual's legitimate expectations of privacy such that a warrantless arrest is permissible.  524

F.3d at 1167, 1169.

## ANALYSIS

The Court will grant Wilson's Motion for Summary Judgment in part.  Jara and Vazquez

violated her Fourth Amendment rights when they seized her person in her home.  The Court cannot

reasonably determine as a matter of law, however, that the Defendants violated Wilson's Fourth

Amendment rights when they reached across the threshold, or when they arrested her for resisting

arrest and obstruction of justice.  The Court concludes that factual disputes, and rule 56's

requirement that all inferences and doubts be resolved in favor of the non-moving party, counsel that

the Court should deny Wilson's Motion for Summary Judgment on all other claims alleged in Count

III of the Complaint.  The Court also finds that New Mexico's Family Violence Protection Act does

not preclude civil liability under 42 U.S.C. § 1983.

I.  **THE COURT WILL GRANT WILSON'S MOTION FOR SUMMARY JUDGMENT IN PART, BECAUSE THE DEFENDANTS VIOLATED WILSON'S FOURTH-AMENDMENT RIGHTS WHEN THEY SEIZED HER PERSON.**

Jara and Vazquez' order to "go get your son" constituted a seizure in violation of the Fourth

Amendment.  The Court cannot, however, determine on the facts presented whether breaching the threshold of the apartment to reach T. Chabot constituted a search of Wilson's home in violation of the Fourth Amendment.  Moreover, the Court cannot reasonably hold, as a matter of law, that Jara and Vazquez lacked probable cause to arrest Wilson.

### A.    THE ORDER TO "GO GET YOUR SON" CONSTITUTED A SEIZURE IN VIOLATION OF THE FOURTH AMENDMENT.

A Fourth Amendment seizure may take place even when a police officer does not physically restrain the citizen, or even make physical contact with him or her.  See Florida v. Bostick, 501 U.S. at 436; United States v. Mendenhall, 446 U.S. at 554.  In fact, the citizen need not even see the officer for the seizure to occur.  See United States v. Maez, 872 F.2d at 1446 (holding that a family was seized in their home where officers stood outside and ordered them out of the home over loudspeakers); United States v. Reeves, 524 F.3d at 1168-69.  See also United States v. Al-Azzawy, 784 F.2d at 893; United States v. Morgan, 743 F.2d at 1163-64.  In Smith v. Kenny, the Court held that when an order to leave the home and surrender to police is communicated via a cellular phone, citizens are seized inside their home.  See 678 F.Supp. 2d at 1173-74.  The relevant determination is the location of the person and whether a reasonable person would feel free to ignore the order. See Smith v. Kenny, 678 F.Supp. 2d at 1174.

Officers seize a person when an officer attempts to assert his or her official authority over a citizen, and the citizen does not feel that he or she is at liberty to disregard that authority.  See Florida v. Bostick, 501 U.S. at 436; United States v. Mendenhall, 446 U.S. at 554.  The reasonableness of the citizen's belief that he is not free to leave is analyzed under an objective standard and "in view of the circumstances surrounding the incident."  United States v. Mendenhall, 446 U.S. at 554.  "Circumstances that indicate a seizure include, 'the threatening presence of several

officers, the display of a weapon by an officer, some physical touching of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'" United States v. Reeves, 524 F.3d at 1167 (quoting United States v. Mendenhall, 446 U.S. at 554).

The undisputed facts indicate that Jara and Vazquez knocked on Wilson's door, and asked to speak to T. Chabot.  See Motion SJ ¶ 8, 11, at 2; Response at 2.  Wilson refused, and the officers continued to converse with Wilson at the threshold of her home.  See Jara's Belt Tape at 2:1-5:8. During that conversation, Jara told Wilson: "I am having a problem with you ma'am," and "you aren't abiding by the law."  Jara's Belt Tape at 5:9-17.  Shortly thereafter, Jara ordered Wilson to "go get your son," and Vazquez said that, if she did not "we're going to go in there."  Jara's Belt Tape at 6:8-10.  Jara repeated that: "We go in there and talk to him, find out his side of the story and (inaudible) or we can come in and --."  Jara's Belt Tape at 6:25-7:2.  Wilson then retrieved T. Chabot.  See Motion SJ ¶ 16, at 3; Response ¶ 16, at 3.

Wilson argues that when Jara and Vazquez ordered her to retrieve T. Chabot, she was seized in violation of the Fourth Amendment.  See Motion SJ at 4.  The Defendants argue that this was not a seizure, because Wilson was not a suspect and because "the Defendants' request allowed Plaintiff Wilson the option not to comply."  Response at 18.  The Defendants further assert that this case is similar to United States v. Johnson, 364 F.3d 1185 (10th Cir. 2004), where the Tenth Circuit recognized that an officer may approach citizens, ask them questions, and ask to see identification without implicating the Fourth Amendment.  See 364 F.3d at 1185.  Finally, the Defendants contend that, because Jara and Vazquez' intention was to speak with T. Chabot, there was no intentional acquisition of physical control over Wilson.  See Response at 20.

Here, the order "go get your son" is a show of authority, similar to the order in United States

v. Flowers to "open the door."  336 F.3d 1224.  The Defendants concede that this statement is a police order.  See Tr. at 14:22-25 (Court, Hoden).  The Defendants argue, however, that the encounter was not directed at Wilson.  This argument lacks a sound basis, as Jara and Vazquez directed the order at Wilson, and the order was aimed at obtaining her compliance.  See Arnold v. Curtis, 359 F.App'x 43, 48-49 (10th Cir. 2009)(unpublished)(holding that, if there was sufficient evidence such that the jury could find that the defendant intended to throw the plaintiff, a third party who was a bystander to the arrest of another, down the stairs, then the plaintiff "satisfied the Supreme Court's definition of a 'seizure.'").   All persons have a right to be free from an unreasonable seizure; that Wilson was not a suspect or that the show of authority "was done in order to make contact with another person" does not lessen her Fourth-Amendment rights to be free from an unreasonable seizure.  See United States v. Botero-Ospina, 71 F.3d 783, 796 (10th Cir. 1995)(stating that, the Fourth Amendment "is intended to protect the innocent from unreasonable police conduct"); United States v. Martinez, 203 F. App'x 757, 758 (9th Cir. 2006)(holding that, where there is no suspicion of criminal activity, a seizure is unconstitutional).

The Court looks to the surrounding circumstances to determine whether a reasonable person would feel free to terminate this encounter.  See United States v. Mendenhall, 446 U.S. at 554.  This incident occurred late at night, and two officers were on Wilson's doorstep.  See Incident History at 1.  Wilson had repeatedly refused to retrieve her son, yet the officers persisted in trying to secure her cooperation.  See Response ¶ N, at 8 ("Plaintiff Wilson continues to refuse to retrieve Plaintiff Chabot . . . .").  The officers informed her that "you aren't abiding by the law," and told her to "go get your son" or "we're going to go in there."  Jara's Belt Tape at 5:9-17, 6:8-10.  A reasonable person told by police officers that she was not abiding by the law and confronted with the alternatives of going to get her son or having the police retrieve him, would believe that she had to

submit to the show of authority.  See United States v. Flowers, 336 F.3d at 1226 n.2 ("[A] reasonable person confronted by police officers outside his door at night and a command by one of the officers to allow them to enter, would have believed that he had to open the door of his home and submit to the show of authority.").

The Court notes that the Tenth Circuit has found a seizure where the police officers' show of authority was even less direct than the conduct at issue here.  In United States v. Reeves, the defendant faced an "implicit command" to open his door from police officers pounding on his door while loudly identifying themselves as police officers and was seized when he responded to the show of authority. 524 F.3d at 1169.  The Tenth Circuit also commented that "labeling an encounter in the home as either investigatory stop or an arrest is meaningless," because Payton v. New York's warrant requirements "apply to all seizures" inside the home.  United States v. Reeves, 524 F.3d at 1166 (citing United States v. Saari, 272 F.3d 804, 809 (6th Cir. 2001)).  The Sixth Circuit in United States v. Saari held that the relevant location is that of the person being arrested, and where the actions of the police seize a person in their home, there is a "constructive entry," which accomplishes the person's arrest.  272 F.3d at 808-09.  Wilson faced a direct command in circumstances where a reasonable person would be expected to obey, and when she retrieved her son, submitting to the Jara and Vazquez' authority, she was seized inside her home.

This encounter went beyond the limits of a consensual "knock and talk" encounter.  United States v. Cruz-Mendez, 467 F.3d 1260, 1264 (10th Cir. 2006)("[A] 'knock and talk' is a consensual encounter and therefore does not implicate the Fourth Amendment, even absent reasonable suspicion.").  A consensual encounter involves "the voluntary cooperation of a citizen in response to non-coercive questioning." United States v. Madrid, 30 F.3d 1269, 1275 (10th Cir. 1994).  A consensual encounter can evolve into a non-consensual encounter.  See United States v. Johnson,

364 F.3d 1185, 1189 (10th Cir. 2004)("The parties disagree about precisely when Johnson's participation became involuntary, thus implicating the Fourth Amendment.").  This evolution occurs when government actions become coercive and imply that an individual has no right to refuse.  See United States v. Harrison, 639 F.3d 1273, 1280 (10th Cir. 2011)(citing cases which demonstrate that an encounter becomes coercive where an officer indicates that there are punitive ramifications to the exercise of a constitutional right).  Jara and Vazquez' statements about the legality of Wilson's refusal, and order to go get her son or that they would do it for her, after persistently asking her to do so, crossed the line from consensual to non-consensual encounter.  See United States v. Williams, 356 F.3d 1268, 1274 (10th Cir. 2004)("It is undoubtedly true that a consensual encounter between a citizen can be transformed into a seizure through persistent and accusatory questioning by police.").  In Jones v. Hunt, police officers told a teenager that, "if she did not agree to live with her father, they would arrest her."  410 F.3d 1221, 1226 (10th Cir. 2005).  The Tenth Circuit held that this scenario went beyond a consensual encounter, and was "transformed into a seizure through Hunt and Haberman's alleged threats and demands."  Jones v. Hunt, 410 F.3d at 1227.  Similarly, the encounter between Wilson, and Jara and Vazquez, exceeded the scope of a consensual encounter, because Jara and Wilson demanded that she go get her son and threatened what they would do so if she did not.  Jara and Vazquez' statements went beyond the general, informational questions that officers employ when conducting a "knock and talk."

The Defendants contend that a reasonable person would have felt free to terminate the counter, because Wilson "could terminate her contact at any time by letting the Defendants deal directly with her son," Response at 18, and that "she could have told them, 'go away' and closed the door," Tr. at 18:16-17 (Hoden).  The question is not whether Wilson could have told the officers to go away, and there is evidence from the depositions that she could not have, but whether a

reasonable person would have believed he or she had to obey the command.  See Jara Depo. at 50:2-4 (responding to a question about whether Jara would have let Wilson close the door and terminate the encounter, Jara replied "No, I wouldn't have.").  A reasonable person would not have believed that she was free to terminate the encounter or disobey the order once Jara and Vazquez insinuated that she was breaking the law, and ordered her to retrieve her son or that they would do it for her.

Jara and Vazquez' statements convey two different concepts to the listener.  The first concept is the order to "go get your son," which Tenth Circuit precedent establishes is a show of authority and could be sufficient to effect a seizure.  See United States v. Flowers, 336 F.3d at 1226 n.2.  The second concept is the coercive statement that, if Wilson does not obey, "we're going to in there."  Jara's Belt Tape at 5:9-17, 6:8-10.  The Defendants contend that the second portion of the statement demonstrates that Wilson had options such that she was not seized.  See Response at 19 ("[S]he could terminate her contact at any time by letting the Defendants deal directly with her son.").  That Wilson could terminate her contact by allowing Jara and Vazquez to deal directly with her son is a false distinction, because it suggests that Wilson could terminate her contact with the police by submitting to their show of authority, which is the definition of a seizure.  See United States v. Flowers, 336 F.3d at 1226 n.2 (finding a seizure where a reasonable person would believe that he had to submit to a show of authority).  Furthermore, the comment that Jara and Vazquez will go get T. Chabot is a threat conveying the consequences of not obeying the order.  A statement is coercive when it conveys that there are "punitive ramifications to the exercise of [a] constitutional right." Eidson v. Owens, 515 F.3d 1139, 1147 (10th Cir. 2008).  Here, there is no dispute that, under the United States Constitution, Jara and Vazquez could not properly enter the house and arrest T. Chabot.  See Tr. at 21:12-15 (Court, Hoden); Vazquez Depo. at 45:10-13.  Jara and Vazquez conveyed, in their statement that they would go retrieve her son, that the consequence of Wilson

-42-

exercising her constitutional rights to not follow their orders in her home absent a warrant were that they would enter her home themselves. The consequences of not obeying was another constitutional violation. That is not a constitutional choice. Such a coercive statement reinforces the order to "go get your son" and the message that Wilson had no right to refuse. See United States v. Harrison, 639 F.3d at 1279-80 (explaining, in the context of consent, that coercive statements "imply an individual has no right to refuse"). Furthermore, the threat here is similar to the "options" that police gave in Jones v. Hunt -- that the plaintiff live with her father or be arrested. See 410 F.3d at 1227. There, the Tenth Circuit determined that a coercive choice between obeying the order or suffering a constitutional violation, an illegal arrest, seizes the person to whom the order is directed. See Jones v. Hunt, 410 F.3d at 1227. Here the coercive choice was between going to get T. Chabot or suffering a constitutional violation -- an illegal search when Jara and Vazquez entered Wilson's home to retrieve T. Chabot. The Defendants conceded that the general rule is that, without a warrant, an officer with probable cause may not enter a home to arrest an inhabitant, and that Jara and Vazquez were only authorized to reach into the apartment if T. Chabot was at the threshold. See Tr. at 20:23-21:25 (Court, Hoden). Jara and Vazquez were, therefore, offering Wilson a choice between submitting to their authority or facing an unconstitutional search. The order is a show of authority that a reasonable person would likely not feel free to ignore; when looking to the "the coercive effect of police conduct, taken as a whole" the coercive threat conveyed in the second portion of the statement confirms the Court's conclusion that Wilson was not free to decline Jara and Vazquez' "request." United States v. Little, 18 F.3d 1499, 1504 (10th Cir. 1994)(en banc)("[F]ocus is on 'the coercive effect of police conduct taken as a whole,' on a reasonable person.").

The Defendants further contend that, looking at the totality of the circumstances, Wilson

"felt she had the right to, obviously, argue with police, because she continued to do it" and that she was free to terminate the encounter.  Tr. at 18:25-19:8 (Hoden).  The Supreme Court has held that a police officer's show of authority does not constitute a seizure unless the person actually submits. See California v. Hodari D., 499 U.S. 621, 626 (1991).  Wilson, however, submitted to the officers' show of authority, because she followed the order and retrieved her son.  Furthermore, this order was an action "through means intentionally applied."  Arnold v. Curtis, 359 F.App'x at 47 (citing Cnty. of Sacramento v. Lewis, 523 U.S. 833, 844 (1998); Brower v. Cnty. of Inyo, 489 U.S. 593, 596 (1989)).  Jara and Vazquez acted through means intentionally applied because their order was not accidental, rather it was an intentional statement that terminated Wilson's freedom of movement. Arnold v. Curtis only requires that the action that the plaintiff alleges causes the seizure not be accidental; here, Jara and Vazquez' order was non-accidental and indicated that compliance was required.  See 359 F.App'x at 47.  It is immaterial that the officers intended to speak with T. Chabot, and did not intend to seize Wilson, because the subjective state of mind of the officers is "wholly irrelevant" to the determination of whether a seizure occurred.  See United States v. Abdenbi, 361 F.3d at 1292-93.

Jara and Vazquez had no warrant,  and no cause to support a seizure of Wilson. Accordingly, their actions constitute an unconstitutional seizure in violation of the Fourth Amendment.  For Wilson to avoid the Defendants' qualified immunity defense, the Court must also find that the right to be free from seizure in one's home in the absence of a warrant was clearly established as of August 16, 2007, such that a reasonable officer would have known of it.  See Overdorff v. Harrington, 268 F.3d at 1168; Gross v. Pirtle, 245 F.3d 1151, 1156 (10th Cir. 2001). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have

found the law to be as plaintiff maintains." Strepka v. Miller, 28 F.App'x 823, 830 (10th Cir.

2001)(quoting Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001)).  The Court finds that the right

to be free from unreasonable seizures -- such as without a warrant, cause, or suspicion while in one's

home -- is clearly established.  See Florida v. Bostick, 501 U.S. at 436; United States v. Mendenhall,

446 U.S. at 554; United States v. Flowers, 336 F.3d at 1226 n.2.  Because the right was clearly

established at the time of the violation, and the Court has found that a violation occurred, Jara and

Vazquez are not entitled to qualified immunity as to this claim.

At the moment Wilson submitted to Jara and Vazquez' order, retrieving T. Chabot from his

bedroom, she was seized in violation of her Fourth Amendment rights.  The right to be free from

a warrantless seizure within one's home is clearly established, and Jara and Vazquez are not entitled

to qualified immunity.  Because the merits of Wilson's claim for an unlawful seizure is established

as a matter of law, the Court grants Wilson's motion for summary judgment as to this aspect of

Count III against Jara and Vazquez.

**B.    THE COURT CANNOT DETERMINE ON THE FACTS PRESENTED THAT BREACHING THE "THRESHOLD" OF THE APARTMENT TO REACH T. CHABOT CONSTITUTED A SEARCH OF WILSON'S HOME IN VIOLATION OF THE FOURTH AMENDMENT.**

Wilson argues that the Defendants "acted in excess of their authority as police officers when

they unlawfully crossed the threshold of the Wilson home and reached in to arrest T. Chabot."

Motion SJ at 6.  The Defendants counter that the threshold was considered to be a public space,

which does not require probable cause, and that Payton v. New York is inapplicable because there

the officers broke into the plaintiff's home.  See Response at 12-14.

The Tenth Circuit draws a distinction between cases where the an individual comes to the

threshold of the door voluntarily and cases where an individual is compelled to come to the door.

-45-

Compare McKinnon v. Carr, 103 F.3d at 935-36 (holding that, where an individual voluntarily opened his front door, he was "in a place sufficiently public that he had no legitimate expectation of privacy" and the police could execute a warrantless arrest), with United States v. Flowers, 336 F.3d at 1226-1227 (holding that, where the defendant came to the door in response to a show of authority by the police, his presence was involuntary, and he did not lose "the constitutional protection afforded to the individual's interests in the privacy of his own home").  There does not appear to be any dispute that Wilson voluntarily answered the door.  At the time the alleged search occurred, however, Wilson was no longer voluntarily at the door because she was seized when she submitted to Jara and Vazquez' order.  Wilson was not free to terminate the encounter, having been ordered to retrieve her son and bring him to the officers at the front door, and was therefore not voluntarily exposing her home to the public view at the time of the search.

If the Court were to extend McKinnon v. Carr to allow police to cross the threshold when an individual is illegally seized, the individual is not free to terminate the encounter, and there is no probable cause to arrest that individual, then the Fourth Amendment rights of citizens would be severely compromised.  McKinnon v. Carr properly applies when an individual is voluntarily at the door and when the police have probable cause to conduct a warrantless arrest.  See 103 F.3d at 935 (holding that a warrantless arrest at the doorway was permissible where plaintiff voluntarily exposed himself to the public when opening the door and that entry into home after the arrest was reasonable where the plaintiff acquiesced as well as to ensure he made no effort to escape).  To hold otherwise would be to allow the police to enter an individual's home, without consent, probable cause, or a warrant, when a citizen answers the door and would involve drawing difficult lines about how far the "threshold" extends.  The Tenth Circuit has never extended McKinnon v. Carr as far as the Defendants assert.  In the two cases where the Tenth Circuit cites McKinnon v. Carr, the Tenth

Circuit does so to distinguish it in <u>United States v. Flowers</u> and cites it without discussion in <u>United States v. Martin</u>, 613 F.3d 1295 (10th Cir. 2010).  <u>See</u> <u>United States v. Flowers</u>, 336 F.3d at 1228; <u>United States v. Martin</u>, 613 F.3d at 1300.

Jara and Vazquez had no authority to execute a warrantless arrest of Wilson, when they arrived at her apartment or when she answered the door and refused to go get her son.  Moreover, Wilson answering the door did not expose T. Chabot to the public.  The Court, therefore, must determine whether T. Chabot appeared at the door voluntarily to justify his warrantless arrest at the threshold.  He could have just heard noise and come to the door voluntarily; he could have come only because Wilson told him what Jara and Vazquez ordered.  Whether Wilson told him about her interaction with Jara and Vazquez and what she told him is important to determining whether he came to the door voluntarily.  The rule in <u>McKinnon v. Carr</u> and <u>United States v. Flowers</u> is focused on why he came to the door and there are no facts indicating why he appeared there.  Neither party adduces facts concerning why T. Chabot appeared at the door and whether he was there voluntarily.  Because the Court must resolve all reasonable inferences and doubts in the non-moving party's favor, the Court will not find that there was an unreasonable search, as a matter of law, and will deny the motion for summary judgment as to this issue.  <u>See</u> <u>Hunt v. Cromartie</u>, 526 U.S. at 550-55.

The Court notes, however, that if T. Chabot did not appear at the door voluntarily -- which is likely the case -- then Jara and Vazquez' actions would constitute an unconstitutional search.  A "police officer's mere entry or trespass into a home without consent is enough to constitute a search, often referred to in the case law as 'unlawful entry.'" <u>Reeves v. Churchich</u>, 484 F.3d 1244, 1258 (10th Cir. 2007)(citing <u>Brigham City, Utah v. Stuart</u>, 547 U.S. 398, 402-03 (2006); <u>United States v. Najar</u>, 451 F.3d at 720; <u>United States v. Carter</u>, 360 F.3d 1235, 1241-42 (10th Cir. 2004); W. R. LaFave et al., 2 <u>Criminal Procedure</u>, § 3.2(c) (2d ed. 1999)).  "Because the home is accorded the full

range of Fourth Amendment protections, it is beyond question that an unconsented police entry into a residential unit, be it a house, apartment, or hotel or motel room, constitutes a search." 2 LaFave Criminal Procedure, § 3.2(c) (3d ed. 2010).

Exigent circumstances would not justify a search of Wilson's home, if the threshold arrest was invalid. The Tenth Circuit employs a two-part exigent-circumstances test looking at whether: (i) the officers have an objectively reasonable basis to believe that there is an immediate need to protect the lives or safety of themselves or others and (ii) the manner and scope of search is reasonable. United States v. Najar, 451 F.3d at 718. The Defendants fail on the first prong, because there was no immediate threat to officer safety. The Defendants argue that Jara and Vazquez were standing in the doorway's "fatal funnel," they were at they were standing at the top of the stairs, and it was a domestic violence call. Response at 22. In United States v. Davis, 290 F.3d 1239 (10th Cir. 2002), the Tenth Circuit held that there is no exigency per se in domestic violence situations and that officers are not exempt from the requirement of demonstrating exigent circumstances. See 290 F.3d at 1244. The Defendants knew that H. Chabot was not in the apartment, and the situation only escalated after the Defendants crossed the threshold of the apartment. See Response ¶¶ V- W, at 9. That the situation involved a domestic violence call does not automatically authorize officers to enter private residences absent some more "immediate need." United States v. Martinez, 686 F.Supp. 2d 1161, 1198 (D.N.M. 2009)(Browning, J.)(holding that police officers utilizing the exigent circumstances exception "may not fall back on bright-line rules based on only a few factors."). Jara and Vazquez' concerns about the "fatal funnel" and their position at the top of the stairs are also generalized concerns. See United States v. Martinez, 686 F.Supp. 2d at 1198. Jara and Vazquez fail to articulate any specific facts which show that Wilson or T. Chabot posed a danger to them before their entry into the apartment. See Cortez v. McCauley, 478 F.3d 1108, 1124

(10th Cir. 2007)("They have failed to articulate any specific facts that led them to believe the Plaintiffs posed a threat to the officers or others."). Finding exigent circumstances where officers does no mare than stand at the top of the stairs or in a doorway, would severely undercut the protections of the Fourth Amendment.

### C.     THE COURT WILL NOT HOLD, AS A MATTER OF LAW, THAT THE DEFENDANTS LACKED PROBABLE CAUSE TO ARREST WILSON.

Wilson argues that her assertion of her constitutional rights did not rise to the crime of "resisting a police officer." Motion SJ at 7. Additionally, Wilson asserts that a person may resist a police officer's unlawful exercise of authority. See Motion SJ at 8-9. The Defendants argue that their actions were initially lawful, because they had authority to reach across the threshold, and that Wilson's actions were not reasonable. See Response at 16-17.

The Court cannot assess the reasonableness of Wilson's conduct without determining whether Jara and Vazquez lawfully reached across the threshold of her home and arrested T. Chabot. There is a factual dispute regarding the contact between Vazquez and Wilson, as well as about the chronology, whether Vazquez entered the apartment or Wilson grabbed first. See Motion SJ ¶¶ 23, 26, at 4-5; Response ¶ 23, 24, at 5. Wilson contends that she grabbed Vazquez after he entered the apartment and that he pushed her off of him. See Motion SJ ¶¶ 22-24, at 3. The Defendants assert that "Plaintiff Wilson stood in front of Plaintiff Chabot and grabbed Defendant Vazquez' arm, then Plaintiff Chabot pulled back deeper into the apartment." Response ¶ 23, at 4. Wilson asserts that Vazquez pushed her, while the Defendants contend that Vazquez was attempting to create space for safety purposes. See Motion SJ ¶ 26, at 3; Response ¶ 26, at 5. These versions of events are materially different, and go to the reasonableness of Wilson's subsequent actions.

Under the Defendants' version of the facts, Jara and Vazquez were lawfully arresting T.

Chabot, when Wilson grabbed Vazquez and stepped in front of T. Chabot, blocking Jara and Vazquez.  See Response at 17.  Wilson aggressively pulled at Vazquez' arm and attempted to interfere with the arrest.  See Response at 17.  When Jara ordered Wilson to stay upstairs, Wilson disobeyed the order and again physically interfered with T. Chabot's arrest.  See Response at 17.  Wilson disturbed her neighbors and created a scene.  See Response at 17.  Construing the facts in this light, Jara and Vazquez might have had probable cause to arrest Wilson.  See N.M.S.A. 1978, § 30-22-1D (Resisting, evading or obstructing an officer consists of: "Resisting or abusing any judge, magistrate or peace officer in the lawful discharge of his duties.").  Because the Court must resolve all reasonable inferences and doubts in favor of the non-moving party, the Court will not find that there was no probable cause to arrest Wilson for resisting arrest or obstruction, and will deny the motion for summary judgment as to this issue.  See Hunt v. Cromartie, 526 U.S. at 550-55.

## II.   THE FAMILY VIOLENCE PROTECTION ACT DOES NOT PRECLUDE CIVIL LIABILITY UNDER § 1983.

The Defendants argue that "[o]fficers responding to a domestic violence call are protected from civil liability pursuant to the New Mexico Family Violence Protection Act, which provides in relevant part [that 'a]ny law enforcement officer responding to a request for assistance under the Family Violence Protection Act is immune from civil liability to the extent allowed by law . . . .'" Response at 23 (citing N.M.S.A. 1978, § 40-13-7).  The Supreme Court has held, however, that "[c]onduct by persons acting under color of state law which is wrongful under 42 U.S.C. § 1983 or § 1985(3) cannot be immunized by state law." Martinez v. California, 444 U.S. 277, 284 n. 8 (1980) (citations omitted).  The Supremacy Clause of the United States Constitution "guarantees that state law will not preempt or otherwise erode § 1983 causes of action and state law may not immunize conduct violative of § 1983." Gronowski v. Spencer, 424 F.3d 285, 297 (2d Cir. 2005).  "A

construction of federal statute which permitted a state immunity defense to have controlling effect would transmute a basic guarantee into an illusory promise; and the supremacy clause of the Constitution insures that the proper construction may be enforced." Martinez v. California, 444 U.S. at 284 n. 8 (citations omitted). The Tenth Circuit has also held that causes of action brought under § 1983 are not subject to the contours of state law. See Palmer v. City of Monticello, 31 F.3d 1499, 1504 (10th Cir. 1994)("More fundamentally, Palmer's federal constitutional claim of violation of a liberty interest is not restricted by the privilege contours of state defamation law.").

Pursuant to the Supremacy Clause, state laws that are incompatible with duly passed federal laws must give way. See Am. Ass'n of People with Disabilities v. Hererra, 580 F. Supp. 2d 1195, 1222 (D.N.M. 2008)(Browning, J.). The New Mexico Family Violence Protection Act cannot thwart the purpose of § 1983, to give individuals a remedy for constitutional violations. If states could limit the scope of recovery under § 1983, then § 1983 would no longer provide meaningful redress of violations. The Supremacy Clause and Supreme Court precedent therefore preclude the New Mexico Family Violence Protection Act from limiting any civil recovery that might be available to Wilson under 42 U.S.C. § 1983.

**IT IS ORDERED** that Plaintiff Martha Wilson's Motion for Summary Judgment, filed July 6, 2011 (Doc. 31), is granted in part and denied in part. The Motion for Summary Judgment is granted as to the claim that Wilson was unconstitutionally seized in her home; on all other claims within Count III, of the Complaint to Recover Damages for Deprivation of Civil Rights (dated July 15, 2010), filed August 25, 2010 (Doc. 1-1), the Motion for Summary Judgment is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Joseph P. Kennedy
Shannon L. Kennedy
Kennedy Law Firm
Albuquerque, New Mexico

   *Attorneys for the Plaintiffs*

Stephanie M. Griffin
Benjamin I. Sherman
Tarra Leigh Hoden
 Assistant County Attorneys
City of Albuquerque
Albuquerque, New Mexico

   *Attorneys for the Defendants*